UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

B.S. by and through his mother G.R.,

                            Plaintiffs,

vs.                                            12-Civ-0441 (RWS)
                                             JUDGE SWEET

NEW YORK CITY DEPARTMENT OF        ECF CASE
EDUCATION,

                            Defendants.               **COMPLAINT**

## VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTIVE RELIEF AND DAMAGES

### PRELIMINARY STATEMENT

1. This case is being brought by G.R., the parent of B.S., a minor child, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1415, *et. seq.* based on the Defendants,' New York City Department of Education's ("the District's"), failure to comply with the stay-put provisions of the IDEA; New York State Education Law §§ 4401 *et. seq.*, and the regulations promulgated thereunder.

### JURISDICTION

2. This Court has jurisdiction under 28 U.S.C. § 1331, in that claims are asserted under the laws of the United States; under 28 U.S.C. § 1343(a), in that claims are asserted under laws providing for the protection of civil rights; and under 42 U.S.C. § 1983. This Court has jurisdiction over Plaintiffs' pendent State law claims pursuant to 28 U.S.C. § 1367. Plaintiffs also seek declaratory relief pursuant to 28 U.S.C. § 2201 and 2202.

1

3. Venue is proper under 28 U.S.C. § 1391(b).

4. If successful, Plaintiffs are entitled to costs and attorneys fees under 42 U.S.C. § 1988 and 20 U.S.C. §1415.

## PARTIES

5. Plaintiff G.R. is the mother of B.S., a child with a disability who is a resident of New York State.

6. Initials are used throughout this Complaint to preserve the confidentiality of the infant plaintiff.

7. Upon information and belief, the District is the official body delegated by New York State with the responsibility for developing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities.  N.Y. Educ. Law §§ 2590, 2590-g (McKinney 2011).  For fiscal year 2009, New York State received over $1.5 billion[1] for the provision of special education services in accordance with its agreement to provide a free and appropriate public education ("FAPE") to resident students. New York State delegates this obligation to its 697 Local Educational Agencies ("LEA")[2] for ease of administration and provides approximately $215,000,000[3] to the New York City Department of Education for this purpose.

## LEGAL FRAMEWORK

8. The IDEA, 20 U.S.C. 1401 *et. seq.*, is a comprehensive scheme passed by Congress to rectify grave deficiencies in the educational opportunities afforded students with disabilities, and to "assure that all children with disabilities have available to them a FAPE which

---

[1] See "IDEA Money Watch" website, http://www.ideamoneywatch.com/main/arp.php
[2] See New York State Education Department's "the Structure of New York State School Districts." http://www.p12.nysed.gov/mgtserv/sch_dist_org/GuideToReorganizationOfSchoolDistricts.htm#
[3] See New York State Education Department website, Information and Reporting Services, http://eservices.nysed.gov/alloweb/mainservlet?a=details&sed=30000010000

emphasizes special education and related services designed to meet their unique needs, [and] to assure that the rights of children with disabilities and their parents or guardians are protected." § 1400(d)(1)(A) and (B).

9.   The vehicle for the provision of FAPE is the Individualized Education Plan ("IEP"), the document which embodies the school district's recommendations for a particular child. *Bd. Of Educ. v. Rowley*, 458 U.S. 176, 181 (1982). Once drafted, the IEP bears the imprimatur of the State, regardless of the LEA that created it, and carries a presumption of correctness. *See Letter to Rieser*, EHLR 211:403 (July 17, 1986)(Exhibit D).

10.  Upon information and belief, New York State is the recipient of funding under the IDEA, 20 U.S.C. § 1400-1487, and, as such has the responsibility to "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate education."  20 U.S.C. § 1415(a). The State Educational Agency ("SEA") exercises general supervision over all programs in the State that provide educational services to disabled students, and must ensure that all such meet State education standards. *Michael C. ex rel. Stephen C. v. Radnor Tp. School Dist.*, 202 F.3d 642, 648 (3d Cir. 2000).

11. One of the most important procedural safeguards provided to parents under the IDEA is the opportunity for an impartial due process hearing to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child. The hearing shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency.  20 U.S.C. § 1415(f)**.**

12. The IDEA's pendency or stay-put provision provides that, where the parents and school district disagree, during the pendency of any proceedings, unless the State and the parents otherwise agree, the child shall remain in the then-current educational placement of the child. 20 U.S.C 1415(j).

13. A motion for stay put functions as an automatic preliminary injunction, without regard to factors such as irreparable harm. *Drinker ex rel. Drinker v. Colonial Sch. Dist.,* 79 F.3d 859 (3d Cir. 1996). "This provision aims to preserve public funding for an educational placement 'consented to by the parent before the parent requested a due process hearing. To cut off public funds would amount to a unilateral change in placement, prohibited by the Act.'"*Mackey ex. rel Thomas M. v. Board of Educ. For Arlington Central School Dist.*, 386 F.3d 158, 163 (2d Cir. 2004) (quoting *Zvi D. v. Ambach*, 649 F.2d 904, 906 (2d Cir. 1982)).

14. The term "educational placement," encompasses at least three components." *See Letter to Rieser*, EHLR 211:403 (July 17, 1986).[4] The first involves the type of placement – in the instant case, a self-contained classroom; the second is the "educational program contained in the IEP including annual goals, short-term objectives and related services;" and the "third and final component is the specific school or facility which the child attends." *Id*. *Letter to Rieser* continued that "these are all ingredients in the 'status quo' which the courts interpreting the statute have required be maintained during the pendency of proceedings." *Id*.

15. "To allow a new LEA to place the child in a regular education program or provide an interim IEP without parental consent would defeat the purpose of the statutory provision – 'to guarantee a coherent educational experience for a disabled child until conclusion of review of a contested IEP [emphasis added].'" *Id*.

---

[4] See *Honig v. Doe*, 484 U.S. 305, FN 8 (1988) (deferring and adopting OSEP construction of the term "change in placement" for purposes of pendency, finding that OSEP is the agency "charged with monitoring and enforcing the statute") .

4

16. District Courts have the power to review and enjoin administrative stay-put orders immediately, not withstanding the fact that they are interim orders. *See M.K. v. Roselle Park Bd. of Educ.*, 2006 WL 3193915 *9 citing *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 199 (2d Cir. 2002).

17. A District Court applies a traditional preliminary injunction analysis to a request to enjoin a preexisting "stay put" order. *See Johnson ex rel. Johnson v. Special Educ. Hearing Office, State of Cal.*, 287 F.3d 1176, 1180 (9th Cir. 2002).

18. To obtain a temporary restraining order or preliminary injunction, a plaintiff must show "irreparable harm and either (a) a likelihood of success on the merits of [his] case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in [the movant's] favor." *Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 77-78 (2d Cir. 1994).

19. The IDEA permits disabled children to vindicate their educational rights through other statutes, including 42 U.S.C. § 1983. <u>See</u> 20 U.S.C. §1415(l).

**FACTUAL ALLEGATIONS OF THE INDIVIDUAL PLAINTIFFS**

20. Plaintiff B.S. is an 11 year old child diagnosed with Autism.

21. B.S. and his family are New York State residents who resided in Bronxville, NY, until the end of the 2010-2011 school year.

22. Beginning in 2005, and through the end of the 2010-2011 school year, the Bronxville Union Free School District ("Bronxville") developed IEPs for B.S. placing him at the Bronxville Elementary School ("the Bronxville School").

23. The parents enrolled B.S. at the Bronxville School in accordance with these IEPs.

24. Bronxville is a LEA that has been designated by New York State, like New York City, to provide special education services in conformity with IDEA procedures in exchange for an allocation of Federal IDEA funds by the State.[5]

25. The Bronxville School is a public elementary school, but Bronxville frequently contracts with other school districts to provide special education services to out of district students.

26. For the 2010-2011 school year, and the summer of 2011, B.S. attended a special class at the Bronxville School for students with Autism with a 6:1:3 staffing ratio which utilized an Applied-Behavior-Analysis ("ABA") approach to instruction. B.S. received daily mainstreaming opportunities consistent with the IDEA's preference for educating students in the "Least Restrictive Environment." 20 U.S.C. 1412(a)(5). B.S. received social skills training through an extended school day program funded by Bronxville for four days per week as well as related services as part of his program at Bronxville.

27. B.S.'s Bronxville program was most recently mandated by his May 6, 2011 IEP.[6] (Exhibit A).

28. B.S.'s mother, G.R., wrote a letter to the New York City School District's CSE in April of 2011, stating that the family would soon move to Queens, providing consent to any evaluations it deemed necessary, and requesting a meeting to discuss Ben's educational program for the upcoming school year.

---

[5] See New York State Education Department website, Information and Reporting Services, http://eservices.nysed.gov/alloweb/mainservlet?a=details&sed=660303030000

[6] An IEP is a written statement for each child with a disability that is developed and reviewed by a duly constituted Committee on Special Education ("CSE") team, and that sets forth the specially designed instruction that the student is to receive. 20 U.S.C. §1414(d)(1)(a).

29. The parent received no meaningful response to this letter.[7] B.S.'s mother thereafter moved to New York City and wrote again to the CSE at the beginning of August reiterating her consent and request for a CSE meeting.

30. G.R. received a phone call from a Comparable Service Plan ("CSP") team at the District informing her that nothing comparable to B.S.'s Bronxville program existed within the New York City public schools and the team would be recommending its typical 6:1:1 autism program, located in a segregated District 75 school for B.S.

31. Conducting no evaluations, the District instead convened a CSP meeting on August 15th, 2011 to recommend special education services within New York City for B.S. for the 2011-2012 school year.

32. G.R. attended and fully participated in the August 15th CSP meeting. G.R. was told that the 6:1:1 programs had no opportunities for mainstreaming, that no extended school day services were available, and that the TEACCH methodology, not ABA, was used in the classrooms.

33. G.R. received a placement notice recommending that B.S. attend the 6:1:1 program at P.S. 993 in Jamaica, Queens. G.R. visited P.S. 993, observed the recommended classroom, and spoke at length to the classroom teacher. Based on her observations, G.R. determined that P.S. 993 was neither appropriate for B.S nor comparable to Bronxville.

34. Consistent with her rights under the IDEA, G.R., through her attorneys, filed an impartial hearing request ("the complaint") on September 19, 2011 challenging the District's recommendations for B.S. and invoking B.S.'s pendency rights under the IDEA. The complaint

---

[7] G.R. received a phone call from a CSE staff member in May informing her that the school district would do nothing for B.S. until he became a resident of New York City.

alleged that B.S.'s last agreed to IEP was the May 6th, 2011 Bronxville IEP and that his placement for purposes of pendency was the Bronxville Elementary School.

35. A "pendency hearing"[8] was held before an IHO on October 6th, 2011. Both parties elicited witness testimony and submitted briefs on the issue.

36. The IHO issued an order on October 24, 2011, properly finding that Bronxville was B.S.'s pendency placement under the law, and ordered the District to maintain and fund B.S. at Bronxville until the substantive issues in the parent's complaint have been adjudicated. The substantive hearing is currently pending before the IHO. (Exhibit B).

37. The District refused to comply with the IHO's order, failed to request a stay of the order, and instead sent a letter to the parent's attorney stating that it would consider appealing that order to the Office of State Review, and would not implement those parts of the order that it chose to appeal.

38. The parent received a copy of the District's Petition to the State Review Officer ("SRO") on November 28, 2011, the last day on which service of a petition would have been proper. The Petition alleged that it would not honor the Bronxville IEP and placement as B.S.'s pendency placement, but that because the family had voluntarily moved to New York City, the proper placement for purposes of pendency was the 6:1:1 class at P.S. 993 – the precise classroom contested by the parent.  The parent submitted a 20 page response to the District's Petition as well as a 20 page memorandum of law in support of its position on December 9, 2011.

39. The SRO issued a decision on December 23, 2011, in which he agreed with the parent that the 6:1:1 program recommendation was not comparable to that of Bronxville, but overturned

---

[8] Based on information and belief, as a practice, the District routinely fail to automatically fund students' pendency placements absent an order from an IHO.

the IHO's finding that Bronxville was B.S.'s pendency placement. The SRO articulated no remedy for B.S. for the period between September 19, 2011 and the date of his decision, but ordered that "the district shall provide the student with a 2:1 shared paraprofessional as part of his comparable services plan during the pendency of these proceedings." *Id*. The SRO made no meaningful findings with respect to mainstreaming or an after school program for B.S., but merely found that B.S. should receive these only "to the extent that they are available to students in the district and shall not be excluded from such programs solely on the basis of his disability." (Exhibit C).

40. The parent maintains that the SRO's reversal of the IHO's order was both arbitrary and baseless, and must be enjoined by this Court. As the merits of B.S.'s case are currently pending before the IHO, the SRO had no evidence or testimony before him to make a ruling on whether a 2:1 shared paraprofessional would remedy the flawed classroom. To date, there has been no testimony on the actual functioning of the classroom and the class ratio is only one component of that recommendation which deviates from that of Bronxville.

41. The parents maintain that the SRO's decision was wholly contrary to Congressional intent and the express purposes of the pendency provision, and biased in favor of the school district.[9] The SRO has left the parent with no remedy for the District's failure to offer B.S. a comparable placement between September and December of 2011. Further, though the parent disagrees with the SRO's order to recommend a 2:1 shared paraprofessional in the classroom for

---

[9] Throughout his decision, the SRO repeats nearly verbatim the District's arguments that B.S. was not entitled to the same pendency protections afforded to other students classified under the Act because his parent had moved to New York City. These statements have no basis in the IDEA as that Act makes no such distinction. Indeed, a school district's burden to both transfer students and students currently residing in district are the same – to provide a FAPE consistent with the student's individualized special educational needs. Where parents challenge the District's recommendations, regardless of where in the state a student resides, the student must remain in his then-current placement in order to provide *stability and consistency in the student's educational program.*

B.S., the District, to date, has failed to act in accordance with that decision and reconvene to offer these additional paraprofessional services.

42. Moreover, the SRO did not apply the necessary preliminary injunction analysis before reversing the IHO's pre-existing stay-put order. *C.f. Johnson*, 287 F.3d at 1180 ("request to enjoin a pre-existing 'stay put' order is handled appropriately by the district court's application of traditional preliminary injunction analysis").

43. The parents further maintain that the IHO's order was well reasoned, and both consistent with the evidence before him, and with the purposes of the Act. 20 U.S.C. §1415(j).

44. The Supreme Court held that with the IDEA's pendency provisions, Congress intended to "strip schools of the unilateral authority they had traditionally employed to exclude disabled students . . . from school." See *Honig v. Doe*, 484 U.S. 305, 323 (1987).

45. A motion for stay put functions as an automatic preliminary injunction, without regard to factors such as irreparable harm. *Drinker ex rel. Drinker v. Colonial Sch. Dist.,* 79 F.3d 859 (3d Cir. 1996). The purpose of the pendency provision is to provide stability and consistency in the education of the disabled student, and requires the school district to maintain the child in his then-current educational placement, and thus preserve the status quo. *Arlington Cent. School Dist. v. L.P.*, 421 F.Supp.2d 692 (S.D.N.Y. 2006).Therefore, regardless of the merits of the parent's challenge to an IEP, *id.* at 161, a state must continue to fund the child's last agreed-upon placement unless and until a new placement is established which occurs when (1) the parents and the state agree on a new placement, *see* 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a); (2) an SRO decision "agrees with the parents that a change of placement is appropriate," *Mackey*, 386 F.3d at 163 (quoting 34 C.F.R. §300.514(a), (c); 34 C.F.R. § 518(d)); (3) an administrative decision agreeing with either the parents or the state goes unappealed, 34

C.F.R. § 300.514(a); *Bd. of Educ. v. Schutz*, 290 F.3d 476, 484 (2d Cir. 2002); or (4) a court upholds a change in placement, *Schutz*, 290 F.3d at 484. *Student X v. N.Y. City Dep't of Educ.*, No. 07-CV-2316 (NGG) (RER), 2008 WL 4890440, at *20 (E.D.N.Y. 2008)." See *New York City Dept. of Educ. v. V.S.*, 2011 WL 3273922, *3 (E.D.N.Y. 2011)(clearly stating that agreement for pendency purposes must be between the *state* and the parent, and not the particular school district).

46. "'Educational placement' encompasses at least three components." *See Letter to Rieser*, EHLR 211:403 (July 17, 1986).[10] The first involves the type of placement, in the instant case, a self-contained classroom; the second is the "educational program contained in the IEP including annual goals, short-term objectives and related services;" and the "third and final component is the specific school or facility which the child attends." *Id*. *Letter to Rieser* continued that "these are all ingredients in the 'status quo' which the courts interpreting the statute have required be maintained during the pendency of proceedings." *Id*.

47. *Letter to Rieser* contemplated the situation where, as here, "a child moves with his parents to a new school district" within the same state and found that once an IEP is developed in an LEA, that "IEP has the imprimatur of the SEA and carries a presumption of correctness." *Id*.

48. "To allow a new LEA to place the child in a regular education program or provide an interim IEP *without parental consent would defeat the purpose of the statutory provision* – 'to guarantee a coherent educational experience for a disabled child until conclusion of review of a contested IEP [emphasis added].'" *Id*. Absent a valid order from this Court in B.S.'s case, such a situation is imminent as the New York City School District seeks to unilaterally change B.S.'s

---

[10] See *Honig v. Doe*, 484 U.S. 305, FN 8 (1988) (deferring and adopting OSEP construction of the term "change in placement" for purposes of pendency, finding that OSEP is the agency "charged with monitoring and enforcing the statute") .

11

pendency placement to the precise 6:1:1 class that was contested by the parent and is currently the subject of the underlying hearing.

49. A unilateral change to the New York City classroom would further violate the Supreme Court's express preference for educating students in the least restrictive environment and with their typically developing peers. *Honig*, 484 U.S. 305, 313 (1988). The program mandated by Bronxville's May 6, 2011 IEP sets out a daily "reverse mainstreaming" program whereby B.S. is permitted to meaningfully interact with general education students. Special education students in New York City's District 75 program are intentionally isolated from their mainstream peers. A unilateral change would therefore deprive B.S. of this service – expressly mandated by Bronxville, and effectively New York State, as appropriate for B.S. for the 2011-2012 school year.

50. B.S. has remained at Bronxville to date during the pendency of proceedings before the IHO. However, absent an *immediate* order by this Court, the Bronxville Union Free School District will dismiss B.S. from school as of February 1, 2012, as no funding mechanism is currently in place to cover the cost of attendance.

51. Failure of this Court to enjoin the SRO's reversal of the IHO's pendency order will result in imminent educational harm to B.S. and cause him to be moved directly into a placement expressly determined by the parent to be neither comparable to Bronxville nor appropriate for B.S. in direct contradiction to the purposes underlying the IDEA's pendency provision. 20 U.S.C. §1415(j).

## CAUSES OF ACTION

52. The District's failure to automatically fund B.S. in his last agreed to placement and its failure implement the IHO's order to fund B.S. at Bronxville deprived B.S. of his right to a free

appropriate public education and due process under IDEA and the regulations promulgated thereunder, and thus deprives him of rights secured by federal law in violation of 42 U.S.C. § 1983.

53. The District has violated B.S.'s rights under New York State Education Law § §4401, 4404 and 4410 and Section 200.5 of the Regulations of the New York State Commissioner of Education, 8 N.Y.C.R.R. § 200.5.

54. The District has violated B.S.'s right under New York State Education Law and 8 N.Y.C.R.R. § 200.5 pertaining to pendency.

**RELIEF**

55. WHEREFORE, the parent requests that this Court:

    a. Issue a Temporary Restraining Order and preliminary injunction:

        i. Ordering the District to implement B.S.'s pendency rights *immediately* and until the substance of the parent's claims have been adjudicated;

    b. Enter a judgment:

        i. Ordering other equitable relief and damages due to the parent as a result of the failures or delay in implementing orders or enforcement of pendency placements as alleged herein;

        ii. Declaring that the District has violated B.S.'s rights as set forth;

    d. Award to Plaintiffs their costs and attorneys fees; and

    e. Grant such other and further relief as may be appropriate.

Dated: January 19, 2012
       New York, New York

Respectfully submitted,

By _____
Samantha Bernstein, Esq.
Jesse Cole Cutler, Esq.

Law Offices of Regina Skyer & Associates
276 Fifth Avenue, Suite 402
New York, NY 10001
Attorneys for the Plaintiffs

## **VERIFICATION**

All the above statements are true to the best of my knowledge. I understand that a false statement in this Verified Complaint may subject me to penalties of perjury.

January 19, 2012                                   _____

SAMANTHA BERNSTEIN, ESQ.